**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

In the Matter of: THORPE
INSULATION COMPANY,

*Debtor,*

---

MOTOR VEHICLE CASUALTY
COMPANY; CENTRAL NATIONAL
INSURANCE COMPANY OF OMAHA;
CENTURY INDEMNITY COMPANY,
successor to Cigna Specialty
Insurance Company, FKA
California Union Insurance
Company,

*Appellants,*

v.

THORPE INSULATION COMPANY;
PACIFIC INSULATION COMPANY,

*Appellees,*

NATIONAL FIRE INSURANCE
COMPANY OF HARTFORD, as
successor by merger to
Transcontinental Insurance
Company; CONTINENTAL INSURANCE
COMPANY, as successor in interest
to certain policies issued by
Harbor Insurance Company;
OFFICIAL COMMITTEE OF UNSECURED
CREDITORS, of Thorpe Insulation
Company and Pacific Insulation
Company; CHARLES B. RENFREW,

*Real Parties in Interest.*

No. 10-56543

D.C. No.
2:10-cv-01493-DSF

In the Matter of: Thorpe
Insulation Company,

*Debtor,*

National Fire Insurance
Company of Hartford, as
successor by merger to
Transcontinental Insurance
Company; Continental Insurance
Company, as successor in interest
to certain policies issued by
Harbor Insurance Company,

*Appellants,*

v.

Thorpe Insulation Company;
Pacific Insulation Company,

*Appellees,*

Central National Insurance
Company of Omaha; Motor
Vehicle Casualty Company;
Century Indemnity Company,
successor to Cigna Specialty
Insurance Company, FKA
California Union Insurance
Company; Official Committee of
Unsecured Creditors, of Thorpe
Insulation Company and Pacific
Insulation Company; Charles B.
Renfrew, Administrative Law
Judge,

*Real Parties in Interest.*

No. 10-56622

D.C. No.
2:10-cv-01493-DSF

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the Central District of California
Dale S. Fischer, District Judge, Presiding

Argued and Submitted
August 30, 2011—Pasadena, California

Filed January 24, 2012
Amended April 3, 2012

Before: Mary M. Schroeder and Ronald M. Gould,
Circuit Judges, and Richard Seeborg, District Judge.*

Opinion by Judge Gould

---

*The Honorable Richard Seeborg, United States District Judge for the
Northern District of California, sitting by designation.

## COUNSEL

David C. Christian, II (argued), Seyfarth Shaw LLP, Chicago, Illinois; James M. Harris, Seyfarth Shaw LLP, Los Angeles, California; Todd C. Jacobs, Grippe & Elden LLC, Chicago, Illinois, for appellants Continental Insurance Company and National Fire Insurance Company of Hartford.

Tancred V. Schiavoni, O'Melveny & Myers LLP, New York, New York; Richard B. Goetz, O'Melveny & Myers LLP, Los Angeles, California; Jonathan Hacker, O'Melveny & Myers LLP, Washington, D.C.; Alan S. Berman, the Berman Law Group, Woodland Hills, California, for appellants Motor Vehicle Casualty Company, Central National Insurance Company of Omaha, and Century Indemnity Company, successor to Cigna Specialty Insurance Company f/k/a California Union Insurance Company.

Thomas E. Patterson (argued), Kenneth N. Klee, Daniel J. Bussel, and David M. Guess, Klee, Tuchin, Bogdanoff & Stern LLP, Los Angeles, California; Jeremy V. Richards and Scotta E. McFarland, Pachulski, Stang, Diehl & Jones LLP, Los Angeles, California, for appellee Thorpe Insulation Company.

John A. Lapinski and Leslie R. Horowitz, Clark & Trevithick, P.L.C., Los Angeles, California, for appellee Pacific Insulation Company.

Peter Van N. Lockwood (argued), Caplin & Drysdale, Chartered, Washington, D.C.; Peter J. Benvenutti, Jones Day, San Francisco, California, for appellee Counsel for the Official Committee of Unsecured Creditors of Thorpe Insulation Company and Pacific Insulation Company.

Gary Fergus, Fergus, A Law Office, San Francisco, California, for appellee Charles B. Renfrew, the Futures Representative.

---

**ORDER**

The opinion in the above-captioned matter filed on January 24, 2012, and found at 2012 WL 178998, 55 Bankr. Ct. Dec. 278, is amended as follows:

At slip opinion page 671, line 29, delete the following two sentences:

<Further, the trust has only distributed $44.7 million for pre-petition claims, claims submitted directly to the trust, the Business Loss Allocation, operating expenses, and contingent and professional fees—only $15 million of this has been to asbestos claimants. This is not half, let alone "substantially all," of the property proposed to be transferred by the plan.>

Judge Gould has voted to deny the Petition for Rehearing En Banc, and Judges Schroeder and Seeborg have so recommended. The full court has been advised of the Petition for Rehearing En Banc and no judge has requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35. The Petition for Rehearing En Banc is denied.

No future petitions for rehearing or rehearing en banc will be entertained.

**IT IS SO ORDERED.**

---

## OPINION

GOULD, Circuit Judge:

The district court affirmed a bankruptcy court's confirmation of a Chapter 11 plan of reorganization under 11 U.S.C. § 524(g), a special provision for the reorganization of companies facing substantial asbestos-related liability. Appellants are several insurance companies that did not reach settlements with Thorpe Insulation Company (Thorpe) and Pacific Insulation Company (Pacific), together the Debtors in bankruptcy court, and who were denied standing to challenge the reorganization plan. The district court held that the reorganization plan was insurance neutral, and so Appellants did not have standing to object to the plan; and it also held that the plan preempted Appellants' state law contract rights. We affirm the district court's conclusion that the plan preempted Appellants' state law contract rights. We disagree with the position of Debtors that the appeal is equitably moot, and, reaching the merits, we reverse the district court's conclusion that Appellants lacked standing. We remand to the district court with instructions that it return the case to the bankruptcy court to give Appellants the opportunity to present their proof and argument.

## I. Background

### A

Thorpe is a California company that distributed, installed, and repaired asbestos insulation products between 1948 and 1972. This led to substantial asbestos-related litigation. In the past thirty years, Thorpe has faced about 12,000 claims and lawsuits for personal injury or wrongful death based on asbestos exposure. Robert and Linda Fults owned Thorpe until 2008, when they transferred their shares to their sons Eric and David Fults. In 2000, Thorpe incorporated Pacific as a wholly-owned subsidiary and conveyed to it the assets associated with its materials division. Robert and Linda Fults were the sole shareholders of Pacific. Pacific, a profitable business, has been named in asbestos-related lawsuits as a successor-in-interest to Thorpe. In 2004, Thorpe sold its remaining assets to Farwest Insulation Contracting ("Farwest"), owned by Eric and David Fults, in a private foreclosure sale. Farwest is also a party to many asbestos-related lawsuits and insurance coverage litigation.

Thorpe purchased insurance policies with many companies that covered "products claims" (or "products/completed operations," for injuries caused by asbestos exposure after a product is relinquished or an operation completed), which are subject to aggregate limits, and "operations claims" (or "non-products," for injuries caused by asbestos exposure before a product is relinquished or an operation completed), which are not subject to aggregate limits. Since 1978, Thorpe's many insurers have handled the defense and settlement of asbestos suits. Thorpe's insurers paid more than $180 million defending and indemnifying Thorpe until, in their view, the policies' aggregate limits were exhausted.[1]

---

[1]It appears that the policies with Continental and Fireman's fund were exhausted in 1998, and the rest of the insurers contend that their policy limits were exhausted in 2005.

## B

Debtors Thorpe and Pacific filed for protection under Chapter 11 of the Bankruptcy Code on October 15, 2007 and October 31, 2007, respectively. Thorpe estimated that, at the time of the bankruptcy filing, 2,000 asbestos cases were pending against it, and Thorpe anticipated that many more suits would be filed in the future.

Thorpe applied to employ the law firms of Snyder Miller & Orton LLP and Morgan Lewis & Bockius LLP as special insurance counsel. Appellants objected that the firms had conflicts of interest because they represented asbestos claimants against Thorpe, but the bankruptcy court approved the employment of the law firms, taking the view that Appellants lacked standing to object. The issue was appealed, the district court remanded for fact-finding, and the bankruptcy court again approved the firms' retention without input from Appellants.

In May 2008, Thorpe, Pacific, the appointed Official Committees of Unsecured Creditors, and the appointed legal representative for holders of future asbestos-related claims ("Appellees") filed a § 524(g) joint plan of reorganization. The current and Fifth Amended Plan of reorganization was filed in December 2009. It is that plan, approved by the bankruptcy court and the district court, that is the subject of this appeal.

Section 524(g) allows a bankruptcy court to issue sweeping channeling injunctions in Chapter 11 cases involving asbestos claims. § 524(g); 4 COLLIER ON BANKRUPTCY ¶ 524.07. The statute was enacted to adopt the approach taken in the *Johns-Manville* bankruptcy case, wherein a trust (the "*Manville* Trust") was established together with a series of injunctions to channel asbestos-related claims to the trust. *See Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988). Because of the often lengthy latency period of asbestos-related inju-

ries, the § 524(g) injunction aims to "control the future litigation of all asbestos-related claims against the parties it protects" by preventing "any entity from taking legal action to collect a claim or demand that is to be paid in whole or in part by a trust created through a qualifying plan of reorganization." COLLIER ON BANK. ¶ 524.07. The injunction may bar actions against the debtor itself as well as claims against the debtor directed at third parties who are directly or indirectly liable—such as where a third party has insured the debtor. *Id.*; § 524(g)(4)(A)(ii). The bankruptcy court may establish such an injunction if it determines that (1) "the debtor is likely to be subject to substantial future demands for payment arising out of" asbestos-related claims; (2) "the actual amounts, numbers, and timing of such future demands cannot be determined"; and (3) "pursuit of such demands outside the [trust] is likely to threaten the [reorganization] plan's purpose to deal equitably with claims and future demands." § 524(g)(2)(B)(ii).

The requirements for a § 524(g) injunction include: (1) there must be a notice and a hearing and the 524(g) plan must be in connection with the confirmation of a Chapter 11 plan of reorganization; (2) there must be a trust established to assume the liabilities of the debtor that has been named in asbestos-related actions; (3) the trust must be funded in whole or in part by the securities of at least one debtor and by the obligation of the debtor to make future payments; (4) the trust must own, or be entitled to own, a majority of the voting shares of the debtor, its parent corporation, and any subsidiary; (5) the court must find that the debtor meets certain criteria related to the significance of the threats posed by potential asbestos liability; (6) the court must appoint a legal representative to protect the rights of future claimants against the debtor; and (7) the court must determine that the injunction is fair and equitable with respect to future claims (including a determination that third parties like insurers that come within the protection of the injunction have contributed adequate amounts to the trust). § 524(g).

The Fifth Amended Plan filed by Debtors provided for the issuance of injunctions to channel certain asbestos-related liabilities to a newly-created trust, with sole responsibility for distributions to present and future holders of asbestos-related claims. The plan merges Thorpe and Pacific into the "Reorganized Debtor" and discharges Thorpe, Pacific, and the Reorganized Debtor from all debts. It creates a trust, controlled by the Trust Advisory Committee, to oversee how claims are allowed, valued, and distributed. The Trust uses "trust distribution procedures" to evaluate claims.

In establishing the plan and trust, Thorpe reached settlements with thirteen insurers ("settling insurers") (in addition to four insurers that settled, contingent on a bankruptcy filing, before Thorpe filed). The settlements provided for more than $600 million in cash and securities to fund the Trust in exchange for releases of claims and protection of 524(g) injunctions. The Debtors contributed the following to the plan: their indemnity claim against the Johns-Manville asbestos trust; the proceeds of the settlements with the Settling Insurers; the "Asbestos Insurance Rights" as defined in the plan; $500,000 cash; and two promissory notes in the amount of $1.25 million, secured by 51% of the common stock of Reorganized Debtor. Appellants received from the trust a "Business Loss Allocation;" the trust pays to them a percentage of the money contributed to the trust by the insurance companies up to $5.25 million.

The plan creates three injunctions. First, the Channeling Injunction bars the assertion of any asbestos-related claim against any protected party and allows for asbestos-related claims only against the trust, the Reorganized Debtor, and non-settling insurers. Second, the Settling Asbestos Insurer Injunction protects settling insurers by preventing the assertion of contribution claims held by non-settling insurers.[2]

---

[2]Some non-settling insurers have insurance policies with the settling insurers ("reinsurance"). This injunction prevents the non-settling insurers from filing claims under those policies.

Instead, the trust absorbs the cost of those barred contributions and reduces dollar-for-dollar any judgment obtained against non-settling insurers holding contribution claims. *Id.* Third, the Asbestos Insurer Injunction prohibits actions against asbestos insurers without permission by the trust; the trust may not allow such actions unless asbestos claimants agree to the same judgment reduction that is binding on the trust before proceeding against non-settling insurers.

The plan contains a valuation matrix. The Matrix gives a way for the trust to value claims consistently across time because of the lengthy latency period of asbestos-related injuries. The value given a claim depends on, *inter alia*, the disease the claimant has, age, work history, and personal history factors.

The plan assigns Debtors' insurance rights to the trust, including policies with the non-settling insurers. The plan contains a section stating that it is "insurance neutral," preserving all "Asbestos Insurance Defenses." However, in apparent contradiction of the neutrality characterization, the plan includes four exceptions to the otherwise preserved defenses. It does not permit a defense:

> (a) that is based on the assertion that the transfer of the Asbestos Insurance Rights to the Trust . . . is invalid, unenforceable or otherwise breaches the terms of any Asbestos Insurance Policy, Asbestos Insurance Settlement, or any other agreement with any Asbestos Insurer, (b) that has been released, waived, altered or otherwise resolved, in full or in part, in any Asbestos Insurance Settlement, or any other agreement with any Asbestos Insurer, (c) to the extent affected by application of principles of res judicata, collateral estoppel, claim preclusion or issue preclusion, or (d) premised upon the commencement of Chapter 11 Cases under Section 301 of the Bankruptcy Code.

The plan allows claimants either to bring their claim against the trust or to get permission from the trust to sue non-settling insurers directly under Thorpe's insurance policies.

Without giving Appellants the opportunity to be heard fully on all relevant issues, the bankruptcy court affirmed the Fifth Amended Joint Plan of Reorganization on February 1, 2010.

## C

After confirmation of the plan by the bankruptcy court, Appellants appealed the order confirming the Fifth Amended Joint Plan of Reorganization. Under § 524(g), the district court must affirm a plan and its injunctions for them to be valid and enforceable. § 524(g)(3)(A). The district court affirmed the plan, modifying the trust distribution procedures slightly, and entered an order issuing and affirming the plan on September 21, 2010.

Two groups of non-settling insurers appeal the district court decision. These are: (1) Continental Insurance Company and National Fire Insurance Company of Hartford (together, "CNA"); and (2) Motor Vehicle Casualty Company, Central National Insurance Company of Omaha, and Century Indemnity Co. (together, "ACE") (both groups together, "Appellants"). Appellants contend that the courts below erred in their preemption rulings, that the plan does not comply with § 524(g), that the plan was not proposed in good faith, that the plan was developed by conflicted counsel, and that they have standing to object to the plan and to appeal.

We denied Appellants' emergency motion for a stay pending appeal but consolidated the two appeals and granted expedited briefing. The plan became effective on October 22, 2010, and implementation of the plan began. Appellees filed a motion to dismiss as moot in February 2011, which the motions panel referred to us.

## II.  Standard of Review

We have jurisdiction under 28 U.S.C. § 158(d)(1). We review de novo the district court's decision on appeal from the bankruptcy court, applying the same standards applied by the district court, without deference to the district court. *Decker v. Tramiel (In re JTS Corp.)*, 617 F.3d 1102, 1109 (9th Cir. 2010). The bankruptcy court's conclusions of law are reviewed de novo, and its findings of fact are reviewed for clear error. *Id.* The preemption, standing, and insurance neutrality rulings present questions of law reviewed de novo.

## III.  Discussion

## A.  Mootness

Appellees contend that the appeal is moot because Appellants did not obtain a stay and there has been substantial confirmation of the plan.[3] We will not entertain an appeal if the case is moot. The "party moving for dismissal on mootness grounds bears a heavy burden." *Jacobus v. Alaska*, 338 F.3d 1095, 1103 (9th Cir. 2003). There are two mootness doctrines to consider—one deriving from Article III of the Constitution, and one from equity. We address these in turn.

**[1]** The jurisdiction of federal courts is limited to actual cases and controversies. U.S. CONST. art. III, § 2, cl. 2. "The test for mootness of an appeal is whether the appellate court can give the appellant any effective relief in the event that it decides the matter on the merits in his favor. If it can grant such relief, the matter is not moot." *Felster Publ'g v. Burrell* (*In re Burrell*), 415 F.3d 994, 998 (9th Cir. 2005) (quoting *Garcia v. Lawn*, 805 F.2d 1400, 1402 (9th Cir. 1986)). We

---

[3]Appellees' contention on equitable mootness is not asserted within its appellate brief, but was the subject of a separate motion to dismiss the appeal as moot, filed by Appellees, and referred to our panel. For the reasons that follow, we deny the motion to dismiss this appeal as moot.

conclude that the appeal is not constitutionally moot because we could reverse plan confirmation or require modification of the plan, thereby giving relief to Appellants.

[2] We next address whether this appeal is moot under the doctrine commonly known as "equitable mootness," which has some sway in bankruptcy cases where public policy values the finality of bankruptcy judgments because debtors, creditors, and third parties are entitled to rely on a final bankruptcy court order. *See, e.g.*, *In re Onouli-Kona Land Co.*, 846 F.2d 1170, 1172 (9th Cir. 1988) (noting the need for finality in bankruptcy); 13B FEDERAL PRACTICE & PROCEDURE § 3533.2.3 (3d ed.) ("Bankruptcy appeals provide numerous examples of the need to protect third party interests arising from substantial implementation of a reorganization plan pending appeal."). Equitable mootness occurs when a "comprehensive change of circumstances" has occurred so "as to render it inequitable for this court to consider the merits of the appeal." *In re Roberts Farms*, 652 F.2d 793, 798 (9th Cir. 1981). The question is whether the case "present[s] transactions that are so complex or difficult to unwind that the doctrine of equitable mootness would apply." *Lowenschuss v. Selnick* (*In re Lowenschuss*), 170 F.3d 923, 933 (9th Cir. 1999). The Second, Third, and Fifth Circuits have developed tests to determine whether an appeal is equitably moot.[4] We

---

[4]The Second Circuit has developed a five part test to determine if constitutional and equitable considerations moot an appeal where there has been substantial consummation. "[S]ubstantial consummation will not moot an appeal if all of the following circumstances exist: (a) the court can still order some effective relief; (b) such relief will not affect the reemergence of the debtor as a revitalized corporate entity; (c) such relief will not unravel intricate transactions so as to knock the props out from under the authorization for every transaction that has taken place and create an unmanageable, uncontrollable situation for the Bankruptcy Court; (d) the parties who would be adversely affected by the modification have notice of the appeal and an opportunity to participate in the proceedings; and (e) the appellant pursued with diligence all available remedies to obtain a stay of execution of the objectionable order . . . ." *In re*

have not yet expressly articulated a comprehensive test, but our precedents have looked at whether a stay was sought, whether the plan has been substantially consummated, whether third party rights have intervened, and, if so, whether any relief can be provided practically and equitably. *Baker & Drake*, 35 F.3d at 1351 (1994) ("moot if a party opposing a reorganization plan has failed to obtain a stay pending appeal, and the plan has been carried out to 'substantial [culmination].' "); *In re Roberts Farms, Inc.*, 652 F.2d at 797-98 (1981) (moot if plan has been so far implemented that impossible to fashion effective relief or where party challenging plan fails to use due diligence to seek a stay); *In re Spirtos*, 992 F.2d at 1006 (1993) (moot if no stay and rights of third parties have intervened, but not if able to fashion relief that is both effective and equitable).

**[3]** We endorse a test similar to those framed by the circuits that have expressed a standard: We will look first at whether a stay was sought, for absent that a party has not fully pursued its rights. If a stay was sought and not gained, we

---

*Chateaugay Corp.*, 10 F.3d at 952-53 (internal citations and quotations omitted).

The Third Circuit considers the following five factors: "(1) whether the reorganization plan has been substantially consummated, (2) whether a stay has been obtained, (3) whether the relief requested would affect the rights of the parties not before the court, (4) whether the relief requested would affect the success of the plan, and (5) the public policy of affording finality to bankruptcy judgments." *Nordhoff Invs., Inc. v. Zenith Elecs. Corp.*, 258 F.3d 180, 185 (3d Cir. 2001). The court gives the factors varying weight depending on the particularity of the plan, putting the most weight on whether the plan has been substantially consummated. *Id.*

The Fifth Circuit considers three factors: "(1) whether the complaining party has failed to obtain a stay, (2) whether the plan . . . has been substantially consummated, and (3) whether the relief requested would affect the rights of parties not before the court or the success of the plan." *TNB Fin., Inc. v. James F. Parker Interests* (*In re Grimland, Inc.*), 243 F.3d 228, 231 (5th Cir. 2001).

then will look to whether substantial consummation of the plan has occurred. Next, we will look to the effect a remedy may have on third parties not before the court. Finally, we will look at whether the bankruptcy court can fashion effective and equitable relief without completely knocking the props out from under the plan and thereby creating an uncontrollable situation for the bankruptcy court. For reasons explained below, we conclude that this appeal is not equitably moot.[5]

[4] First, this is not a case where Appellants sat on their rights; they sought a stay and were refused both by us and by the Circuit Justice. A failure to seek a stay can render an appeal equitably moot. *In re Roberts Farms*, 652 F.2d at 797-98. However, failure to obtain a stay does not require a conclusion of equitable mootness where parties use due diligence in seeking the stay. *In re Lowenschuss*, 170 F.3d at 933 (not equitably moot where sought stay but bankruptcy court refused to grant it). In such a circumstance, where a party has done nothing by its own inaction to encourage or permit developments to proceed without its participation, courts should be cautious about reaching a conclusion of equitable mootness. To say that a party's claims, although diligently pursued, are equitably moot because of the passage of time, before the party had a chance to present views on appeal, would alter the doctrine to be one of "inequitable mootness." Although practicalities necessarily may take center stage in a particular case, we decline in every case to elevate expediency over the justice of the situation. If Appellants here have presented appellate claims that can be remedied by some reasonable means without totally dislodging the § 524(g) plan, it

---

[5]We make no determination that Appellants' rights have necessarily been impaired, except in so far as they were not permitted to be heard on the relevant issues in the bankruptcy court, nor that the plan is necessarily deficient. We are remanding so that Appellants can have a full and fair opportunity to present evidence and be heard on those issues before the bankruptcy court.

would be inequitable to dismiss their appeal on equitable mootness grounds merely because the reorganization has proceeded. The failure to gain a stay is one factor to be considered in assessing equitable mootness, but is not necessarily controlling.

[5] Second, we next determine whether substantial consummation of the plan has occurred. The Bankruptcy Code defines substantial consummation as: (a) transfer of all or substantially all of the property proposed by the plan to be transferred; (b) assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and (c) commencement of distribution under the plan. 11 U.S.C. 1101(2). Here, though distribution under the plan has commenced, all or substantially all of the property the plan proposes to transfer has not been transferred. The plan involves $600 million in settlement proceeds, and, per the current record, only $135 million has been transferred to the trust.[6] We conclude that the plan has not been substantially consummated.[7]

[6] Third, we must evaluate "whether modification of the plan of reorganization would bear unduly on the innocent." *In re 203 N. LaSalle St. Pshp.*, 126 F.3d 955, 961 (7th Cir. 1997), judgment rev'd on other grounds, 526 U.S. 434 (1999). An important consideration is whether all the parties affected by the appeal are before the court. *See, e.g.*, *In re Arnold & Baker Farms*, 85 F.3d at 1420; *In re Spirtos*, 992 F.2d at 1007. The plan has proceeded and third party rights have intervened to some extent because the trust has both made and

---

[6]Appellants object to the declaration offered by Appellees containing this information. We overrule the objection and consider the evidence.

[7]If the plan was substantially consummated, that would not be the end of the inquiry. We would agree with our sister circuits, see note 5 *supra*, that we could still assess whether effective relief might be given without fully impairing the prior plan and other pertinent circumstances.

received payments. Appellees argue that any changes made to the plan would be inequitable because asbestos claimants voted on the plan relying on the transactions it created, and any change would unfairly affect the bargain they received. However, in determining whether an appeal is equitably moot, the question is not whether it is possible to alter a plan such that no third party interests are affected, but whether it is possible to do so in a way that does not affect third party interests to such an extent that the change is inequitable. If we followed Appellees' argument, no party that failed to obtain a stay in § 524(g) cases would ever be able to appeal, because third party rights would always be affected in some way. We reject that position. The Third Circuit has allowed changes to a 524(g) plan where the plan had already been approved by claimants. *Combustion Eng'g*, 391 F.3d at 201-02 (bankruptcy court added super-preemptory provision after approval by majority of asbestos claimants).

**[7]** Also, the plan provides that it may be modified after confirmation with consent of the trust advisory committee and the Futures Representative but without a vote by asbestos claimants. While the claimants agreed to the plan, they did not agree to a plan that promised no future changes. Further, the appointed Futures Representative is a party to this appeal. The bankruptcy court and the Futures Representative can ensure that any changes to the plan after remand are made in a way that is equitable to all affected parties. Finally, the bankruptcy court could fashion remedies that would not impact the asbestos claimants in a negative way, such as requiring the Debtor to contribute more money to the trust. Appellees argue that the plan is also equitably moot because the reorganized debtor received credit from California Bank & Trust, which creates third party reliance on the plan. But even if the bank extended credit to the reorganized debtor in reliance on the plan, we do not think that remedies short of reversing plan confirmation would affect the bank in an inequitable way.

**[8]** Fourth, and most importantly, we look to whether the bankruptcy court on remand may be able to devise an equita-

ble remedy. Because traditional equitable remedies are extremely broad and vest great discretion in a court devising a remedy, we expect that if there is violation of Appellants' legal rights from the plan, the bankruptcy court should be able to find a remedy that is appropriate. The plan has thus far proceeded to a point where it may not be viable totally to upset the plan, to tip over the § 524(g) apple cart. Yet, that does not mean that there could not be plan modifications adequate to give remedy for any prior wrong. Where equitable relief, though incomplete, is available, the appeal is not moot. *Paulman v. Gateway Venture Partners III, L.P.* (*In Re Filtercorp, Inc.*), 163 F.3d 570, 578 (9th Cir. 1998).

There are several ways here that Appellants could get some relief without completely upsetting the plan. First, Appellees challenge the sufficiency of plan funding. The district court, on appeal, could require Appellees to contribute more to the trust. As an example, the court could require Appellees to return the $2.5 million they have received pursuant to the Business Loss Allocation. *In re Spirtos*, 992 F.2d at 1007 ("We can fashion effective relief by ordering Debtor, who is a party to this appeal, to return the money to the estate."); *see also Platinum Capital, Inc. v. Sylmar Plaza, L.P.* (*In re Sylmar Plaza, L.P.*), 314 F.3d 1070, 1074 (9th Cir. 2002) (finding appeal not equitably moot because remedy was monetary and debtors were solvent). Second, Appellants could receive relief from the bankruptcy court if it amends the plan to make clear that the trust distribution procedures are not binding on direct suits filed against Appellants; because a potentially binding effect is part of what gives the insurers a legally protected interest, *see* section III.B.1, *infra*, a remedy on these lines may be appropriate. *See e.g. Combustion Eng'g*, 391 F.3d at 201-02 (bankruptcy court added super-preemptory provision after approval by majority of asbestos claimants and district court also made changes). Third, the bankruptcy court could allow Appellants to present evidence and argue for modification of the trust distribution procedure. *Varela v. Dynamic Brokers, Inc.* (*In re Dynamic Brokers, Inc.*), 293

B.R. 489, 494 (B.A.P. 9th Cir. 2003) (finding appeal not equitably moot where payments were to be made over twenty years and distribution could be adjusted over time). Fourth, the Appellants would receive relief by placing the trust under new governance if the bankruptcy court credits their argument that the trust is in the hands of biased parties.

**[9]** If abandonment of the § 524(g) plan were the only possible remedy, then there might be equitable mootness. However, we expect that there are many options open to the bankruptcy court other than complete plan reversal that can remedy some of Appellants' claims if proved valid. Therefore, we hold that this appeal is not equitably moot.

## B.  Standing

Two types of standing are at issue: (1) standing to object to the confirmation of the plan in bankruptcy court ("bankruptcy standing") and (2) standing to appeal that confirmation ruling ("appellate standing"). Appellate standing requires that a party be directly and adversely affected by the order of the bankruptcy court—that it diminish the appellant's property, increase its burdens, or detrimentally affect its rights. *Duckor Spradling & Metzger v. Baum Trust* (*In re P.R.T.C., Inc.*), 177 F.3d 774, 777 (9th Cir. 1999). On bankruptcy standing, the interests in a fair plan are paramount, and the bankruptcy court is open to all "parties in interest." 11 U.S.C. § 1109(b). A party denied standing in the bankruptcy court has appellate standing to challenge that determination. *See, e.g.*, *In re Global Indus. Tech, Inc.* (*In re GIT*), 645 F.3d 201, 209 n.23 (3rd Cir. 2011) (en banc). All parties agree that Appellants have appellate standing to appeal the finding of insurance neutrality and to appeal the preemption holding. Because there is no real issue on appellate standing here, we turn to consider bankruptcy standing, and whether the bankruptcy court should have heard Appellants more fully on the issues of concern to them.

**[10]** To have standing in bankruptcy court, Appellants must meet three requirements: (1) they must meet statutory "party in interest" requirements under § 1109(b) of the bankruptcy code; (2) they must satisfy Article III constitutional requirements; and (3) they must meet federal court prudential standing requirements.

## (1)

We first consider whether Appellants had statutory standing under § 1109(b), which provides that:

> [a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

§ 1109(b). The "party in interest" standard has generally been construed broadly. *See In re GIT*, 645 F.3d at 210-11 (list not exclusive); *Kaiser Aerospace & Elec. Corp. v. Teledyne Indus. (In re Piper Aircraft Corp.)*, 244 F.3d 1289, 1304 n.11 (11th Cir. 2001) (party in interest is defined non-exclusively in § 1109(b)); *Hasso v. Mozsgai (In re La Sierra Fin. Servs.)*, 290 B.R. 718, 728 (B.A.P. 9th Cir. 2002) (list is nonexclusive); *In re Shoen*, 193 B.R. 302, 311 (Bankr. D. Ariz. 1996) (broad definition); *In re Standard Insulations, Inc.*, 138 B.R. 947, 950 (Bankr. W.D. Mo. 1992) (party in interest not limited to examples listed). "[C]ourts must determine on a case by case basis whether the prospective party has a sufficient stake in the proceedings so as to require representation." *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3rd Cir. 1985).

**[11]** The Seventh Circuit determined that § 1109(b) was not intended to provide standing exclusively for the listed examples, but rather was meant to give standing to "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding." *In re James Wilson Assocs.*, 965

F.2d 160, 169 (7th Cir. 1992). The Third Circuit agreed, finding that the list of potential parties in interest in § 1109(b) is not exclusive and adopting the "legally protected interest" test as a "helpful amplification" of its "sufficient stake in the proceeding[s]" test set out in *In re Amatex*. *In re GIT*, 645 F.3d at 210. Indeed, the Third Circuit noted that Article III standing and standing under the Bankruptcy code were effectively co-extensive. *Id.* at 211.

The bankruptcy court in this case approached the question of standing for Appellants as one of insurance neutrality, an approach taken by other courts. *See, e.g.*, *In re GIT*, 645 F.3d 201; *In re Combustion Eng'g, Inc.*, 391 F.3d 190 (3d Cir. 2004); *Baron & Budd, P.C. v. Unsecured Asbestos Claimants Comm.*, 321 B.R. 147 (D.N.J. 2005). The bankruptcy court concluded that because the plan was insurance neutral, Appellants had no standing.[8]

[12] Appellants argue that the plan is not insurance neutral because of possible preclusive effects of the plan, because they are responsible for claims channeled to the trust, because the trust permits direct file suits against Appellants, because they are a contingent beneficiary of the trust, and because the plan and trust distribution procedure can be changed without court supervision.[9] We conclude that the plan may economi-

---

[8]Appellees argue that this case is indistinguishable from *In re Combustion Engineering* where the Third Circuit found that non-settling insurers had no standing because the plan was insurance neutral. Even if that case had been adopted as controlling Ninth Circuit precedent, it is distinguishable. *In re Combustion Engineering* was decided in the context of appellate standing and applied the more stringent "person aggrieved" standard, not the "party in interest" standard used in determining whether standing in bankruptcy is appropriate. Further, the plan in *In re Combustion Engineering* was vastly different. There, the plan explicitly preserved all insurance defenses except for the assignment clause in the insurance contracts. Here, the plan contains exceptions to insurance defenses that go beyond the anti-assignment clause exception. Thus, the standard in *In re Combustion Engineering* was different, as was the plan.

[9]Appellants also argue that they had standing because of the preemption of their anti-assignment state rights. Appellants had standing on that issue.

cally affect Appellants in substantial ways. A plan is not insurance neutral when it may have a substantial economic impact on insurers.

[13] First, Appellants claim that there is a possibility that the plan will have a preclusive effect in asbestos suits brought against them by claimants. We conclude this claim has merit. Though the plan recites that it is insurance neutral, this characterization in and of itself does not settle the issue. Instead, we must look to the real-world impacts of the plan to see if it increases insurance exposure and likely liabilities of Appellants.

The plan creates four exceptions to Appellants' insurance defenses. One such exception is that insurance defenses are not preserved "to the extent affected by application of principles of res judicata, collateral estoppel, claim preclusion or issue preclusion." The bankruptcy court held that the plan was insurance neutral, but, at the same time, it held that "the Debtors' insurers may or may not be bound by the Trust's resolution of its claimed liability on an Asbestos Related Claim." The bankruptcy court further provided that "[w]hether and to what extent the values generated by the Internal Procedures will bind a particular Non-Settling Asbestos Insurer will be resolved in the Coverage Litigation."[10]

[14] These conclusions appear to be contradictory, or at least in serious tension with each other. If the Appellants *may* be bound by the Trust's determination of an amount of liabil-

_____

Further, assignment of the insurance contracts to the trust does not provide standing to challenge anything other than preemption as long as all other rights are preserved. *Combustion Eng'g*, 391 F.3d at 216. Preemption of anti-assignment clauses do not, alone, destroy the insurance neutrality of the plan.

[10]The Coverage Litigation are cases in California state court in which some non-settling insurers and Thorpe are litigating the extent of coverage provided by the insurance policies.

ity on an asbestos claim, it would be hard to see how that would not have a real impact on the appellant insurance companies. If the actual amount of payments due from insurance companies is increased by the plan from what those liabilities would be absent the plan, then the plan has monetary impact in the real world of insurance, and is not insurance neutral. Here Appellants reasonably complain that they were not permitted to participate in establishing the valuation matrix. That would be no problem if they could challenge amounts set by it, but it is a problem for them if they may be bound by it without prior participation.

**[15]** The language in the plan and in the bankruptcy court's order is different from the "super-preemptory" language contained in the plan in *In re Combustion Engineering*, where the court determined the plan had no impact on insurers. There, the plan stated:

> Notwithstanding anything to the contrary in this Order, the Plan or any of the Plan Documents, nothing in this Order, the Plan or any of the Plan documents (including any other provision that purports to be preemptory or supervening), shall in anyway [sic] operate to, or have the effect of, impairing the insurers' legal, equitable or contractual rights, if any, in any respect.

*In re Combustion Eng'g*, 391 F.3d at 209. Even if there is a super-preemptory provision, "care must be taken to ensure that, in fact, the insurer's rights are completely unaffected. If the insurer's rights are affected in any way, the insurer will have standing to object to the alteration of its rights." COLLIER ON BANK. ¶ 1109.04. Here, the express exceptions to Appellants' defenses signal that the plan is not insurance neutral.

Second, Appellants must indemnify payments made by the trust pursuant to settlements with asbestos claimants. Without participation by Appellants, the trust determines how much to

pay to the claimants and then may seek payment from Appellants. For the same reasons discussed above, the plan would not necessarily permit the insurers to challenge settlement amounts as unreasonable.

Third, under the plan, the trust can allow asbestos claimants to file direct suits against Appellants. "As a general matter, . . . parties with potential responsibility to pay claims against debtors regularly have standing to participate in bankruptcy cases." *Baron & Budd*, 321 B.R. at 158. For this reason, each of the insurers who may be sued directly and may be liable to claimants should be viewed as a party in interest to the proceedings establishing the trust. Moreover, if the trust runs out of money because it is insufficiently funded or because the trust distribution procedures are insufficiently stringent, the likelihood of claims being brought against the non-settling insurers increases. If the trust runs out of money, the channeling injunctions will preclude claimants from seeking damages from any other insurers than the non-settling insurers. This would have a substantial economic impact on Appellants.

Fourth, the plan may have economic consequences for Appellants by affecting their reinsurance with settling insurers. Because the injunction protects the settling insurers, Appellants' only recourse for any contribution, subrogation, or indemnification resulting from reinsurance is against the trust making them beneficiaries. The order confirming the plan states that the trust may not permit a direct claim against a non-settling insurer unless the claimant agrees in writing to reduce the judgment by the amount the settling insurer owes to Appellants. The order further provides that in direct action litigation, if the non-settling insurer is found to have a claim against a settling insurer for litigation costs, and they are unable to recover those costs through a judgment reduction, then the non-settling insurer can bring an action against the Trust for that amount. If the Trust runs out of money because it is insufficiently funded, then any costs that Appellants could have recovered against it will be lost. The right to

recover costs is a right provided for by a contract negotiated between the settling insurer and the non-settling insurer. This right is a legally protected right. Any inadequacy in the trust threatens to diminish the value of Appellants' claims. Therefore, the insurers' allegations that the plan does not comply with the funding requirements of § 524(g) are sufficient to establish standing.

**[16]** In summary, the plan allows direct actions against Appellants. It allows the trust to pay out claims according to the trust distribution plan and then to seek indemnification from Appellants. It terminates Appellants' ability to collect claims from settling insurers. It affects the nature of Appellants' contracts with Appellees. Though § 524(g) contemplates this kind of interference with insurers' contracts, there is no doubt that the vast changes to the insurance policies and relationships have the potential substantially to impact Appellants economically. The plan is therefore not insurance neutral, which provides the non-settling insurers with party in interest standing under § 1109(b). We hold that appellants had bankruptcy standing and should have been permitted to be heard in challenging the plan, if they had Article III standing and satisfied prudential standing requirements.

### (2)

Having found that Appellants are parties in interest under § 1109(b), we consider whether they also satisfy the requirements of Article III standing. To have constitutional standing under Article III, the party seeking standing must demonstrate an injury in fact that is traceable to the challenged action and that is likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). As applied in the Chapter 11 context, Article III standing exists where "the participant holds a financial stake in the outcome of the proceeding such that the participant has an appropriate incentive to participate in an adversarial form to protect his or her interests." COLLIER ON BANK. ¶ 1109.04; *see also United*

*States v. 5208 Los Franciscos Way*, 385 F.3d 1187, 1191 (9th Cir. 2004).

**[17]** Appellants had Article III standing. As discussed above, the plan affects Appellants' contractual rights, affects their financial interests, and has the possibility of affecting their litigation rights in court. The plan potentially increases the liabilities of the insurance companies with real world economic impact, and, as such, Appellants have sufficiently alleged an injury in fact. This injury is traceable to the plan. It is only because of the plan that Appellants' contractual rights and expectations were changed. This injury would be redressed by judicial action, such as if the bankruptcy or district court reversed confirmation of the plan or altered the plan to make it insurance neutral. All three required elements of the *Lujan* test are satisfied, and Appellants have Article III standing.

### (3)

"In addition to the immutable requirements of Article III, 'the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing.' " *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (quoting *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474-475 (1982)). This prudential principle is a "judicially self-imposed limit[ ] on the exercise of federal jurisdiction." *Allen v. Wright*, 468 U.S. 737, 751 (1984). It is "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Selden*, 422 U.S. 490, 498 (1975). One of these prudential requirements is that "[a] plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision or constitutional guarantee invoked in the suit." *Bennett*, 520 U.S. at 162. "The 'zone of interests' requirement is analogous to 'statutory standing.' " *In re Chiu*, 266 B.R. 743, 749 (B.A.P. 9th Cir. 2001) (quoting *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 669 n.13 (7th

Cir. 1998)). "[T]he predecessor provisions of section 1109(b) of the Code, constituted an effort to encourage and promote greater participation in reorganization cases. . . . Section 1109(b) continues in this tradition and should be understood in the same way." *In re Amatex*, 755 F.2d at 1042; *see also* 7 Collier on Bank. ¶ 1109.04[2][b] ("A fundamental purpose of section 1109(b) is to grant any party with a financial stake in the case the right, at the party's election, to participate with respect to the judicial determination of any issue bearing on the ultimate disposition of his or her interest.").

**[18]** Appellants have § 1109(b) standing, or bankruptcy standing. Also, as insurers of the Debtors, they were within the "zone of interests" protected or regulated by the statutory provision. Congress intended § 1109(b) to confer broad standing so that those whose rights would be affected by reorganization proceedings could participate and protect their rights.

**(4)**

**[19]** Having determined that Appellants met statutory ("party in interest"), constitutional (*Lujan* Article III test), and prudential ("zone of interests") standing requirements, we next consider the extent of their standing in bankruptcy court. Section 1128(b) states that "[a] party in interest may object to the confirmation of a plan." § 1128(b). Because Appellants are parties in interest, they should have had standing to object to confirmation of the plan. *In re GIT*, 645 F.3d at 211 ("Status as a party in interest is of particular relevance here because the Bankruptcy Code expressly provides that parties in interest 'may object to confirmation of a plan.' "); *see also* Collier on Bank. ¶ 1109.04[2][a] ("[E]very court would seem to agree that section 1109(b) applies in full force to a plan confirmation proceeding given the momentous nature of this proceeding in most cases."). For this reason the non-settling insurers had a right to be heard, to present evidence, and to participate in the proceedings culminating in approval of the § 524(g) plan.

## C.   Preemption

Appellants also appeal the district court's determination that their anti-assignment contract rights were preempted by state law. The plan assigns Thorpe's insurance rights to the trust and excludes from Appellants' defenses any defense based upon violation of the anti-assignment clauses. However, the policies under which Thorpe is insured contain language requiring Appellants' consent before an assignment or transfer of policy rights. Under California law, assignment of insurance benefits may violate an anti-assignment provision if the claim against the policy has not been "reduced to a sum of money due or to become due under the policy." *Henkel Corp. v. Hartford Accident and Indemnity Co.*, 29 Cal. 4th 934, 944 (2003). The bankruptcy and district courts determined that bankruptcy law preempted the anti-assignment clauses in the insurance policies.

"We must be cautious about conflict preemption where a federal statute is urged to conflict with state law regulations within the traditional scope of the state's police powers," and we begin with a "presumption against preemption." *Chae v. SLM Corp.*, 593 F.3d 936, 944 (9th Cir. 2010). But, "[i]t is a familiar and well-established principle that the Supremacy Clause . . . invalidates state laws that 'interfere with, or are contrary to,' federal law." *Hillsborough Cnty. v. Automated Med. Laboratories, Inc.*, 471 U.S. 707, 712 (1985). In determining whether preemption exists, "[t]he purpose of Congress is the ultimate touchstone . . . ." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996).

Preemption can occur either expressly or impliedly. "Express and implied preemption under the Bankruptcy Code are two distinct concepts." *PG&E Co., v. Cal. ex rel. Cal. Dep't of Toxic Substances Control*, 350 F.3d 932, 948 (9th Cir. 2003). "Congress may indicate pre-emptive intent through a statute's express language or through its structure and purpose." *Altria Group, Inc. v. Good*, 129 S. Ct. 538, 543 (2008)

In the absence of express preemption, Congressional intent can be inferred where "it is impossible for a private party to comply with both state and federal requirements, . . . or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

**(1)**

[20] Here Congress has expressly preempted Appellants' contract rights. Section 541(c) provides that "an interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law . . . that restricts or conditions transfer of such interest by the debtor . . . ." 11 U.S.C. § 541(c)(A). In *In re Combustion Engineering*, the Third Circuit held that the Bankruptcy Code "expressly contemplates the inclusion of debtor insurance policies in the bankruptcy estate." *In re Combustion Eng'g*, 391 F.3d at 219 n.27. The court held that § 541 "effectively preempts any contractual provision that purports to limit or restrict the rights of a debtor to transfer or assigns [sic] its interest in bankruptcy." *Id.*; *see also In re Kaiser Aluminum Corp.*, 343 B.R. 88, 95 (D. Del. 2006) (541(c) expressly preempts anti-assignment clauses).

Appellants argue that precedent precludes a finding that 541(c)(1)(A) preempts the contract provisions. They point to *In re Farmers Markets* and argue that § 541(c) does not preempt state laws that put limitations on transfers of property to third parties. *In re Farmers Markets, Inc.*, 792 F.2d 1400, 1402 (9th Cir. 1986). That case involved the question of whether § 541(c) preempted a state law that disallowed the transfer of a liquor license until the holder paid certain state taxes. *Id.* at 1401. There, the court held that § 541(c) does not invalidate all transfer restrictions on property in which the debtor holds an interest, but "avoids only those restrictions which prevent transfer of the debtor's property to the estate."

*Id.* at 1402. Therefore, the state could require the estate to pay the taxes before allowing the transfer of the license to a third party. *Id.* at 1404. Here, however, the trust is not a third party. The order confirming the plan provides that the trust is appointed as the estate representative. The trust is part of the debtor's estate. Instead of attempting to sell or assign anything to third parties, the debtor was attempting to transfer its rights and property to the trust, part of the estate. Accordingly, *In re Farmers Markets* does not preclude a finding that 541(c) preempts Appellants' anti-assignment contract rights.

Appellants also argue that in *PG&E* we held that a reorganization plan may preempt nonbankruptcy law "only to the extent that such law 'relates to financial condition.' " *PG&E,* 350 F.3d at 937. They argue that since Appellants' rights do not relate to a "financial condition" preemption is not appropriate here. In *PG&E* we dealt only with §§ 1123(a) and 1142(a), and issues of express preemption by those provisions, and did not interpret § 541(c) as we do here. *PG&E* is not applicable to the preemption issue in this case, as it doesn't tell us whether the anti-assignment clauses in the contracts between insurers and the debtors are preempted by § 541(c).

### (2)

Even if 541(c) did not expressly preempt the anti-assignment provisions, this would not end the inquiry because "[i]t is possible for there to be no express preemption under a particular provision of the Bankruptcy Code, but nonetheless to be implied preemption under the Code." *PG&E*, 350 F.3d at 948. "Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law." *Hillsborough Cnty.*, 471 U.S. at 713. "We discern congressional objectives by 'examining the federal statute as a whole and identifying its purpose and intended effects.' " *Chae,* 593 F.3d at 943 (quoting *Crosby*, 530 U.S. at 373).

**[21]** Here, enforcing the anti-assignment clauses would stand as "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[11] *English v. Gen. Elec. Co.*, 496 U.S. at 79 (quoting *Hines*, 312 U.S. at 67). As the district court noted, *Henkel* would bar any company with significant insurance contracts governed by California law from taking advantage of 524(g). For a plan to be approved, the trust must be sufficiently funded. As here, companies usually can do so only by settling with insurers and putting those funds in the trust. Yet, if we enforced the anti-assignment provisions, it would be to the detriment of the potential efficacy of a § 524(g) plan. After a debtor had filed for bankruptcy, no insurer would settle, with the aim of funding a § 524(g) plan, because by refusing to settle, the insurer could position itself to claim forfeiture of the insurance if a plan proceeded and there was a consequent breach of the anti-assignment provisions. "Simply making a reorganization more difficult for a particular debtor, however, does not rise to the level of 'standing as an obstacle to the accomplishment of the full purposes and objectives of Congress.' " *In re Baker & Drake, Inc.*, 35 F.3d at 1354 (quoting *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 300 (1988)). This is not the case here, because enforcing the anti-assignment provisions would subject virtually all § 524(g) reorganizations to an insurer veto.

**[22]** We are unconvinced by Appellants' argument that Appellees are merely allowed to reorganize under § 524(g) but not entitled to do so and accordingly preemption is not appropriate. Section 524(g) was specifically designed to allow companies with large asbestos-related liabilities to use Chapter 11 to transfer those liabilities, along with substantial

---

[11]Appellants argue primarily that enforcing the anti-assignment provisions does not make it impossible to reorganize. Even if we accept Appellants' premise, this does not wholly resolve preemption. Instead, we must assess whether the anti-assignment provisions stand as an obstacle to the objectives of Congress. *See Crosby*, 530 U.S. 363; *Chae*, 593 F.3d 936.

assets, to a trust responsible for paying future asbestos claims. *See* H.R. Rep. No. 103-835, at 46-47 (1994). It requires that a trust be established that assumes the debtor's asbestos liabilities. § 524(g)(2)(B)(I). Part of the "cornerstone" of the reorganization is contribution by the insurers to the trust. *Travelers Indem. Co. v. Bailey*, 129 S. Ct. 2195, 2199 (2009). For such reasons we hold that the anti-assignment provisions contained in the contracts between Appellants and Appellees stand as an obstacle to completion of a successful § 524(g) plan, and therefore are preempted by federal bankruptcy law.

## IV.   Conclusion

We reject Appellees' argument that this appeal should be dismissed as "equitably moot." Although the plan has proceeded to a point where it may be inequitable to toss it out entirely, we also conclude that there are likely viable remedies available to Appellants, short of entirely tossing the plan out, within the broad remedial discretion of the bankruptcy court, if it determines that Appellants' claims (discussed in footnote one) have merit.

The bankruptcy court and district court erred by concluding that the proposed § 524(g) plan was insurance neutral and that Appellant insurers did not have party in interest standing to challenge the plan. Because the plan had likely effects that would increase economic exposure of the insurer Appellants to asbestos claimants, they had a right to be heard fully and fairly before the plan was finalized. Also, we affirm the bankruptcy court's and district court's conclusions that the anti-assignment clauses in the contracts between insurers and the Debtor were preempted by federal law.

**[23]** There is no entirely tidy way to resolve this case because the plan has proceeded without stay and without full input from insurer parties who will be economically affected by the plan. But we have concluded that the starting place is for us to reverse the judgment of the district court, and to

remand to the district court with instructions that it remand to the bankruptcy court to permit Appellants to submit their proof on all issues they previously preserved.

**REVERSED AND REMANDED with instructions.**