M. SMITH, Circuit Judge,
dissenting:
I respectfully dissent.
The majority wrongly concludes that the interests of Southwest Value Partners (SWVP), a third-party investor with no pre-petition interest in this bankruptcy, should not inform our assessment of whether it would be prudent or equitable to disturb this reorganization plan at this late stage. It is only by ignoring these interests that the majority is able to conclude that any equitable remedies would be available in this case. In reality, the remedies the Lender proposes are grossly inequitable to SWVP and would surely jeopardize the reorganization. More broadly, the majority’s decision discourages potential investors from relying on the finality of bankruptcy court confirmation orders, or from investing in struggling properties until all bankruptcy litigation is concluded, which, as in this case, can take many years. This impedes the Bankruptcy Code’s goal of “maximizing debtors’ estates and facilitating successful reorganization,” to the detriment of both debtors and *1152 creditors. In re Continental Airlines, 91 F.3d 553, 565 (3d Cir.1996).
The majority and I agree that this plan has been substantially consummated, and that this factor weighs in favor of finding this appeal equitably moot. We disagree, however, regarding just how much weight the factor should carry. While I agree that “the fact that a plan is substantially consummated ... does not, by itself, render an appeal moot,” In re Mortgages Ltd., 771 F.3d 623, 629 (9th Cir.2014) (internal quotation marks omitted), substantial consummation should be our “foremost consideration” in assessing equitable mootness, see In re Continental Airlines, 91 F.3d at 560. Indeed, as the majority acknowledges, many of our sister circuits have held that substantial consummation creates a presumption of equitable mootness. See Aetna Cas. & Sur. Co. v. LTV Steel Co. (In re Chateaugay Corp.), 94 F.3d 772, 776 (2d Cir.1996); Rochman v. Ne. Utils. Serv. Grp. (In re Pub. Serv. Co. of N.H.), 963 F.2d 469, 473 n. 13 (1st Cir.1992); In re AOV Indus., Inc., 792 F.2d 1140, 1149 (D.C.Cir.1986). While we have not recognized such a presumption, nothing in our precedents suggests that we should not accord significant weight to substantial consummation in determining whether an equitable and effective remedy is available. Cf. In re Mortgages, 771 F.3d at 629 (recognizing that “[sjubstantial consummation of a bankruptcy plan often brings with it a comprehensive change in circumstances that renders appellate review of the merits of the plan impractical,” but that courts must still consider whether it is possible to “fashion effective relief’).
I strongly disagree with the majority’s conclusion that the equitable mootness doctrine is not meant to protect the interests of a third-party investor in SWVP’s position. The majority concludes that we should not consider how the proposed remedies will affect SWVP’s interests because SWVP participated in the bankruptcy proceedings, and this appeal. But we have never held that we may ignore a third-party investor’s interests merely because the third party participated in the proceedings. The majority relies in part on the Fifth Circuit’s decision in Bank of New York Trust Co. v. Official Unsecured Creditors’ Committee (In re Pacific Lumber Co.), 584 F.3d 229 (5th Cir.2009). However, that case involved a reorganization plan that had been crafted by a creditor and a competitor of the debtor. Id. at 238. It was therefore at least arguably fair to discount the creditor and competitor’s interests in deciding whether the appeal was equitably moot, since they were responsible for the deficiencies in the plan. Id. There is no indication that SWVP had any connection to this case until the Debtors approached it to fund a reorganization plan the debtors had already crafted. In fact, a different third-party investor initially agreed to fund the plan. It was only after the first investor unexpectedly declined to pursue the transaction that SWVP agreed to make an investment on terms that were substantially similar to those the Debtors had previously negotiated with the other third-party investor. Once SWVP agreed to fund the plan, it was only natural that it would be involved in the bankruptcy proceedings, since its investment was the very reason the proposed reorganization was feasible. See In re GWI PCS 1 Inc., 230 F.3d 788, 801-02 (5th Cir.2000) (rejecting argument that “insiders” “lack[ed] good faith reliance on the reorganization plan,” and noting that “it would be natural for many, if not a majority, of the transactions set forth in a reorganization plan to involve the participants of the chapter 11 proceedings.”).
The majority suggests that SWVP was not entitled to rely on the finality of the confirmation order because it could reasonably foresee that the order would be *1153 appealed. This argument unduly focuses on the reasonableness of SWVP’s reliance, rather than on the compelling reasons why investors should be affirmatively encouraged to rely on the finality of confirmation orders. As the Third Circuit has observed,
[o]ur inquiry should not be about the “reasonableness” of the Investors’ reliance or the probability of either party succeeding on appeal. Rather, we should ask whether we want to encourage or discourage reliance by investors and others on the finality of bankruptcy confirmation orders. The strong public policy in favor of maximizing debtors’ estates and facilitating successful reorganization, reflected in the Code itself, clearly weighs in favor of encouraging such reliance. Indeed, the importance of allowing approved reorganizations to go forward in reliance on bankruptcy court confirmation orders may be the central animating force behind the equitable mootness doctrine.
In re Continental Airlines, 91 F.3d at 565. This case illustrates perfectly why encouraging reliance on bankruptcy confirmation orders is critical to facilitating complex reorganizations. Once a third party like SWVP invests to improve the debtors’ capital, to the benefit of creditors and debtors alike, it is much more difficult for it to walk away if the terms of its bargain are altered on appeal. The rule the majority endorses ignores the realities of the marketplace, and creates strong incentives for investors to delay funding improvements until after the appeal is completed, which may take years. It has already taken approximately three years since SWVP funded the plan in this case. Had SWWP waited to fund improvements, the Debtors’ hotels would still be depreciating in value, and perhaps might even have been abandoned for want of funding. This would have negatively impacted the Lender by decreasing the value of its collateral and impeding, or terminating, the ability of the Debtors to generate cash flow and service their debt. Worse, the majority approach discourages third parties from agreeing to make these kinds of post-confirmation investments in the first instance. This is likely to detrimentally impact both creditors and debtors by decreasing the value of debtors’ estates ex ante and making it more difficult to facilitate workable reorganizations. As the Seventh Circuit has eloquently observed:
Every incremental risk of revision on appeal puts a cloud over the plan of reorganization, and derivatively over the assets of the reorganized firm. People pay less for assets that may be snatched back or otherwise affected by subsequent events. Self-protection through the adjustment of prices may affect the viability of the reorganization, and in any event may distort the allocation of assets away from the persons who can make the most valuable uses of them and toward persons who are less sensitive to the costs of ex post changes of plans. By protecting the interests of persons who acquire assets in reliance on a plan of reorganization, a court increases the price the estate can realize ex ante, and thus produces benefits for creditors in the aggregate.
In re UNR Indus., Inc., 20 F.3d 766, 770 (7th Cir.1994), cert. denied, 513 U.S. 999, 115 S.Ct. 509, 130 L.Ed.2d 416 (1994). Once this plan was confirmed, and once the Lender’s request for a stay was denied, the very success of the reorganization depended on SWVP promptly funding improvements in reliance on the confirmation order. Reliance should be encouraged here, not discouraged.
There is another reason we absolutely must consider the impact the proposed remedies will have on SWVP. To determine whether this appeal is equitably *1154 moot, we must assess whether the remedies will “completely knock[ ] the props out from under the plan and thereby ereat[e] an uncontrollable situation for the bankruptcy court.” Motor Vehicle Cas. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.), 677 F.3d 869, 881 (9th Cir. 2012). Because the success of the entire reorganization plan hinges on SWVP’s investment, answering this question requires us to predict whether SWVP will still consider this transaction attractive if the requested remedies are imposed.
There is ample reason to believe that incorporating the proposed remedies into the reorganization plan could cause SWVP to stop funding improvements and divest. The Lender suggests that “the bankruptcy court could compensate Lender for the value of its extinguished collateral by amending the Plan to provide a distribution to Lender equal to the approximately $30 million that SWVP paid for the new ownership interests in the reorganized Debtors.” As the majority acknowledges, for all practical purposes this would amount to a “distribution of money from SWVP to [the] Lender.” The majority contends that the bankruptcy court can simply order SWVP to pay the Lender. But it is not that simple. SWVP was not a party to this bankruptcy, and there is no indication in the record that SWVP is obligated to invest in the Reorganized Debtors and continue to fund improvements if the plan is unwound. Therefore, if the confirmation order is vacated, the only thing keeping SWVP at the table will be its substantial sunk costs. The bankruptcy court could attempt to achieve a transfer from SWVP to the Lender indirectly by modifying the reorganization plan and hoping that SWVP’s sunk costs deter it from divesting. But it is unlikely that SWVP will accept a plan that requires it to pay an extra $30 million, the amount of SWVP’s investment under the original plan, to the Lender.
Nor is it likely that SWVP will view the other two proposed remedies any more favorably. The Lender suggests that “the bankruptcy court could replace Lender’s collateral by providing Lender with a lien on the ownership interests in the reorganized Debtors.” The Lender does not explain why SWVP would wish to continue to invest in renovating the properties of the reorganized Debtors if its ownership interest was suddenly subject to a lien. The other remedy the Lender proposes, full due-on-sale protections, would also fundamentally alter the economics of the transaction. SWVP’s right to sell the hotels after five years was undoubtedly an essential feature of SWVP’s bargain.
Even if the proposed remedies could be imposed on SWVP without jeopardizing its commitment to funding the improvements, it would not be equitable to do so. As the majority recognizes, we must address each of the Lender’s claims separately. The Lender’s first claim is that the ten-year exception to the due-on-sale clause should be removed because it negated the Lender’s § 1111(b) election. However, it does not appear that the original loan even contained a due-on-sale provision. Instead, the original loan permitted transfers of the properties on substantially similar terms as the ten-year exception to the due-on-sale clause contained in the reorganization plan. The Lender is therefore seeking greater protections than it had under the original loan. It would not be equitable to upset the plan at this juncture to provide protections that the Lender has no reasonable basis to expect.
The Lender’s second claim is that the Mezzanine Debtors did not have any impaired class of creditors voting for the plan. The Lender acquired the mezzanine loan after the plan was proposed, knowing that the plan, if confirmed, would extinguish the mezzanine loan’s collateral. *1155 That collateral was worthless, because it consisted of the Mezzanine Debtors’ equity-interest in the deeply insolvent Operating Debtors. Therefore, as the majority acknowledges, the mezzanine loan only had value because, according to the Lender’s view of the law, it allowed the Lender to veto the plan.
The majority concludes that this issue is not equitably moot because the bankruptcy court can compensate the Lender for the loss of its veto right by, for instance, “re-quir[ing] SWVP to pay [the] Lender one dollar....” We disagree about whether the bankruptcy court can require SWVP to pay the Lender directly. But even if it could, the availability of this relief would not justify upsetting the plan at this stage. It will generally be possible to award a nominal sum without wholly upsetting the economics of the plan. However, if this nominal remedy qualified as the “effective and equitable relief’ required by our equitable mootness cases, see In re Thorpe, 677 F.3d at 881, a remedy would always be available and no case would ever be equitably moot. The proper inquiry here is not only whether some nominal sum could be awarded, but whether it is prudent and fair at this juncture to vacate the confirmation order and jeopardize this reorganization.
I conclude that it is neither prudent nor fair. The majority would have us upset this successful reorganization for the sole purpose of vindicating the Lender’s purported right to thwart a viable plan of reorganization, a right it strategically acquired on the eve of confirmation. This strongly conflicts with the Bankruptcy Code’s purpose of promoting successful reorganization. In re Continental Airlines, 91 F.3d at 565. The public interest in promoting reliance on the finality of bankruptcy court confirmation orders, as well as basic fairness to SWVP, now greatly outweigh the Lender’s interest in receiving compensation for its strategically acquired veto right.
I respectfully dissent.