**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN THE MATTER OF: TOWER PARK PROPERTIES, LLC, <br><br> *Debtor*, <br><br> ALEXANDER HUGHES, Sole Non-Contingent Beneficiary of the Mark Hughes Family Trust, <br><br> *Appellant*, <br><br> v. <br><br> TOWER PARK PROPERTIES, LLC, <br> *Appellee*. | No. 13-56045 <br><br> D.C. No. 2:13-cv-01006-GHK <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
George H. King, Chief District Judge, Presiding

Argued and Submitted
June 3, 2015—Pasadena, California

Filed September 28, 2015

Before: Raymond C. Fisher and Jay S. Bybee, Circuit Judges and Elizabeth E. Foote,[*] District Judge.

Opinion by Judge Bybee

## SUMMARY[**]

### Bankruptcy

The panel affirmed the district court's judgment dismissing for lack of standing Alexander Hughes' appeal from the bankruptcy court's order approving a settlement agreement in the Chapter 11 bankruptcy of Tower Park Properties, LLC.

The panel held that a beneficiary of a trust who disagrees with the way the trust was administered by former trustees is not a "party in interest" under 11 U.S.C. § 1109(b) with standing to object to the bankruptcy court's approval of a settlement agreement between a debtor, creditor entities held by the trust, and the former trustees, at least where the beneficiary's interests are adequately represented by a party-in-interest trustee.

---

[*] The Honorable Elizabeth E. Foote, District Judge for the U.S. District Court for the Western District of Louisiana, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

## COUNSEL

Scott D. Bertzyk (argued), Eric V. Rowen, Howard J. Steinberg, Kevin P. Garland, Karin Bohmholdt, and Matthew R. Gershman, Greenberg Traurig, LLP, Los Angeles, California, for Appellant.

Jeremy V. Richards (argued) and Dean A. Ziehl, Pachulski, Stang, Ziehl & Jones LLP, Los Angeles, California; David B. Golubchik and Daniel H. Reiss, Levene, Neale, Bender, Yoo & Brill L.L.P., Los Angeles, California, for Appellee.

## OPINION

BYBEE, Circuit Judge:

The Bankruptcy Code confers a "right to be heard" with respect to "any issue in a case under [Chapter 11]" on any "party in interest." 11 U.S.C. § 1109(b). We have previously held that party-in-interest status is a necessary prerequisite to bankruptcy standing. *In re Thorpe Insulation Co.*, 677 F.3d 869, 884 (9th Cir. 2012). In this case, we consider whether a beneficiary of a trust who disagrees with the way the trust was administered by former trustees is a "party in interest" with standing to object to the bankruptcy court's approval of a settlement agreement between a debtor, creditor entities held by the trust, and the former trustees.[1] We hold that the trust beneficiary does not have party-in-interest standing under § 1109(a) to object to the settlement, at least where his

---

[1] Given the evolving status of Hughes' efforts to remove the original trustees, discussed *infra*, the statement of the issue is based on the fact the trustees were formally removed by order of the probate court.

interests are adequately represented by a party-in-interest trustee. We thus affirm the judgment of the district court dismissing this case for lack of standing.

I

A. *The Facts*

Appellant Alexander Hughes ("Hughes") is the only son of Mark Hughes, the founder of Herbalife who passed away in 2000, and is the sole, non-contingent beneficiary of the Mark Hughes Family Trust ("Trust"). Mark Hughes' estate had an estimated worth of over $300 million at the time of his death, and the bulk of his estate was placed in the Trust. *See Hughes v. Klein*, 2015 WL 1455981, at *1 (Cal. Ct. App. Mar. 30, 2015) (unpublished). The Trust principal must remain in the Trust, per Mark Hughes' instructions, until Alexander turns 35 in 2026. *Id.* Before his death, Mark Hughes named three successor trustees to the Trust: Conrad Lee Klein, Christopher Pair, and Jack Reynolds. *Id.* Once they assumed responsibility for the Trust, the trustees agreed that Klein would act as the lead, full-time trustee and manager of the Trust's various corporate holdings. *Id.* The Trust owns two LLC's relevant here: Hughes Investment Partnership, LLC ("HIP") and MH Holdings II H, LLC ("MH II") (together, the "Hughes Entities"). Virtually all of the Trust's assets are held either by one of the Hughes Entities or another LLC owned by the Trust.

At the time of Mark Hughes' death, MH II owned a real property asset called "Tower Grove"—a 157-acre undeveloped residential property located on a hill overlooking Beverly Hills, California. In 2004, the trustees authorized the sale of the Tower Grove property to Tower

Park Properties, LLC ("Tower Park"), the debtor and appellee. Notably, the sale was entirely seller-financed; MH II loaned Tower Park the $23.75 million required to purchase the property. HIP advanced additional funding to Tower Park for the purpose of developing Tower Grove. Through that transaction, MH II and HIP became the two largest secured creditors of Tower Park.[2]

## B. *Bankruptcy Court Proceedings*

Tower Park soon defaulted on its obligations and, in July 2008, filed for Chapter 11 bankruptcy. As of 2009, HIP and MH II's aggregate claims, which included the purchase, construction, and development financing plus interest, amounted to approximately $57 million. Tower Park's proposed plan of reorganization restructured the Hughes Entities' loans, modifying the interest rates and conditionally reducing the principal balance on certain loans. The proposed plan further provided that HIP would provide Tower Park with $7 million in exit financing. The bankruptcy court entered an order confirming Tower Park's Chapter 11 plan in April 2010. After the confirmation of the plan, however,

---

[2] This case concerns only a part of the substantial litigation that the sale of Tower Grove spawned. We grant Hughes' motion to take judicial notice of various documents filed in the U.S. District Court for the Central District of California in a related proceeding (No. 2:13-cv-01518-GHK) and in the California probate court trustee removal proceeding (Los Angeles Superior Ct. No. BP063500). We also take judicial notice of the California Court of Appeal's decision on appeal from the probate court, *Hughes v. Klein*, 2015 WL 1455981 (Cal. Ct. App. Mar. 30, 2015), and Tower Park's Chapter 11 case and adversary proceedings in the U.S. Bankruptcy Court for the Central District of California (Nos. 2:08-bk-20298; 2:12-ap-01803; 2:12-ap-01845). *See Harris v. Cnty. of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) ("We may take judicial notice of undisputed matters of public record.").

disputes arose between the trustees, the Hughes Entities, and Tower Park over the implementation of the plan provisions. For two years, the parties litigated various disputes in bankruptcy court and, in at least one adversary proceeding, Tower Park named Klein individually as a defendant, alleging various claims of personal misconduct.

Consequently, Tower Park entered into negotiations with the trustees and Hughes Entities to settle the disputes. After six weeks of negotiations and two full-day mediation sessions, Tower Park and its various associated entities entered into a Settlement Agreement with HIP, MH II, Conrad Klein (individually and as trustee), and Jack Reynolds (individually and as trustee).[3] The Agreement was signed in early January 2013. The day after the Agreement was signed, Tower Park filed a motion seeking bankruptcy court approval of the Agreement. *See* Fed. R. Bankr. Proc. 9019(a) ("On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement."). Tower Park requested and received an expedited hearing date, which the court set for later that month.

Meanwhile, Hughes had just completed a several months long trial in California probate court concerning a petition he had filed back in 2010 to remove the three trustees. The petition alleged that each of the trustees had committed various breaches of fiduciary duty with respect to the sale of Tower Grove and other trust management decisions. The

---

[3] It is unclear from the record why Christopher Pair, one of the three co-trustees, was not a party to the Settlement Agreement. Although Pair did not sign the Agreement, the Agreement states that Tower Park will dismiss with prejudice all matters against Pair in either his individual or trustee capacity.

parties were still awaiting a final decision by the probate court when Tower Park filed its motion for approval of the Settlement Agreement. Six days after the Agreement was filed, Hughes filed an ex parte application with the probate court seeking the immediate suspension of the trustees and the appointment of a successor trustee. The probate court granted the motion the same day. In place of the trustees, the probate court appointed Fiduciary Trust International of California ("FTIC") as trustee ad litem. The court ordered FTIC to "analyze . . . and independently determine whether the [Settlement] . . . is proper and in the best interests of the Trust," and "take whatever action is necessary and appropriate to promote or forestall approval of [the Settlement]."

The day after the probate court suspended the trustees, Hughes filed an Objection to the Settlement Agreement with the bankruptcy court. He asked the bankruptcy court to take judicial notice of the pending probate court proceedings, including his petition for removal in probate court, ex parte application, and the probate court's grant of immediate suspension of the co-trustee's powers. Based on his concerns about the trustees' potential breach of trust, Hughes contended that the Agreement was not negotiated in good faith and constituted an impermissible modification of a "substantially consummated" plan, prohibited under § 1127(b) of the Bankruptcy Code. Specifically, Hughes observed that under the proposed Agreement, HIP and MH II agreed to accept a "discounted payoff amount" of $57.5 million in "full satisfaction" of the Tower Park obligations under its loans, if approved by the bankruptcy court and paid by a certain date. The Agreement acknowledged that as of December 2012, the total outstanding balance on the Hughes Entities' loans had risen to approximately $81.6 million. The

discounted payoff amount of $57.5 million thus equaled a $24.1 million (or thirty-percent) reduction of Tower Park's debt. Pointing to his removal petition, Hughes contended that the trustees agreed to the Agreement's "massive," thirty-percent reduction of the debt in exchange for personal gain: $5 million in cash and "broad personal releases," not subject to court approval, to "avoid the prospect of having to defend and settle the claims using their personal funds after they are removed as trustee[s] of the Hughes Trust."[4] Based on these objections, Hughes asked the bankruptcy court to deny approval of the Agreement, or, in the alternative, hold the matter in abeyance to allow the trustee ad litem—appointed just the day before—adequate time to review the Agreement.

FTIC filed a "Limited Joinder" to Hughes' Objection, joining only the portion requesting abeyance of the approval motion "to enable [FTIC] to review and independently determine whether the Agreement is proper and in the best interests of the Trust."

On January 16, Tower Park filed a reply opposing Hughes' Objection and FTIC's Limited Joinder on the grounds that both Hughes and FTIC lacked standing to object to the Settlement Agreement. Tower Park argued that Hughes' status as beneficiary of the Trust does not confer standing to object. Additionally, it contended, FTIC lacked standing because it represents the Trust, and the Trust was not

---

[4] The Settlement Agreement contained reciprocal releases. Tower Park and its entities agreed to dismiss with prejudice "all actions, adversary proceedings, contested matters or motions" filed against HIP, MH II, Conrad Klein, Jack Reynolds, and Christopher Pair. HIP, MH II, Conrad Klein, and Jack Reynolds conditionally agreed to dismiss with prejudice all pending actions filed against Tower Park and its entities.

a party to the Settlement Agreement. Tower Park further argued that the Settlement meets the Rule 9019 criteria, offers benefits to the estate, does not constitute an impermissible plan modification, and was negotiated in good faith under the mediator's guidance. Hughes did not file a response to Tower Park's reply.

In late January 2013, the bankruptcy court held its scheduled hearing on the approval of the Settlement Agreement. The debtor argued that the Settlement is "great" for the estate, discounting the debt by over $20 million. "But the main thing," the debtor explained, "is that the litigation goes away. There's finality, there's certainty[,] and we can move forward with developing the property and getting the lender paid knowing what the amount is." Counsel for Hughes explained his reasons for objecting to the Settlement and argued that Hughes had standing to object because, among other reasons, he would be financially impacted by the Settlement as the sole, non-contingent beneficiary of the Trust. FTIC also defended its standing to object and explained that it needed more time to fulfill its mandate from the probate court to independently assess the benefits of the Agreement for the Trust. While unable to take a position on the propriety of the former trustees' actions at the time of the hearing, FTIC made clear that it intended to investigate and determine whether the co-trustees acted outside the bounds of their fiduciary obligations, and take appropriate action.

At the close of the hearing, the bankruptcy court stated that it would approve the Settlement. Although the Settlement "troubled" the court, it was not an improper modification and it clearly benefited the estate. The court also concluded that Hughes and FTIC had standing: "[A]lthough I have questions about it, I think from my

standpoint that you have standing. It's a close question, but I think that they have standing." Later on, the court acknowledged that standing is "a tricky little question," but explained that "I always like to give the benefit of the doubt to people that have standing." With that explanation, the court issued its order granting Tower Park's motion to approve the Settlement Agreement and overruling Hughes' objection.

In March 2013, after the Settlement Agreement was finalized, the probate court issued its final decision regarding the removal of the co-trustees. The court found that the trustees breached their duty to act with prudence, skill and diligence when, among other things, they sold Tower Grove to Tower Park. The court explained that the Tower Park principal to whom the co-trustees entrusted the development of Tower Grove "had no formal education in real estate, property management, real estate financing, and no professional licenses or certifications." Consistent with its prior ruling, the court ordered the co-trustees removed from their duties and retained FTIC in place as the interim trustee ad litem. The probate court's decision was recently affirmed by the California Court of Appeal. *See Hughes v. Klein*, 2015 WL 1455981, at *8 (Cal. Ct. App. Mar. 30, 2015) (unpublished).

## C.  *District Court Proceedings*

In February 2013, Hughes and FTIC took separate appeals to the U.S. District Court for the Central District of California to challenge the bankruptcy court's approval of the Settlement. The district court dismissed Hughes' appeal for lack of bankruptcy standing, principally because it concluded that Hughes was not a "party in interest" as required under

the Bankruptcy Code. Quoting the Second Circuit's decision in *In re Refco Inc.*, 505 F.3d 109, 118 (2d Cir. 2007), the court explained that "'[b]ankruptcy court is a forum where creditors and debtors can settle their disputes *with each other*,'" and it would be "unfair to allow what is essentially a dispute between Alex Hughes and the Hughes Trust trustees about whether the Settlement is 'too good' for [Tower Park] to obstruct [Tower Park's] 'speedy and efficient' reorganization." The court noted that Hughes also had alternative forums available to resolve his dispute with the trustees, and indeed, had been using them: "since 2010, he has been litigating in probate court a petition to remove the Hughes Trust trustees for alleged 'self[-]dealing and breaches of fiduciary duties.'" In sum, the court concluded, "[Hughes'] stake is too remote, and allowing such remote parties to participate would unduly obstruct the bankruptcy with collateral issues." After holding that Hughes lacked party-in-interest status, the court analyzed Hughes' Article III standing and found that he had none. The district court thus declined to address whether Hughes had prudential standing. Accordingly, the court dismissed Hughes' appeal for lack of standing. Hughes timely appealed.

Although the district court dismissed Hughes' appeal for lack of standing, it did not dismiss the appeal taken by FTIC. At present, FTIC continues to litigate before the district court. In fact, FTIC has taken the position that the Conditional Provisions became null and void when Hughes' appeal to the district court prevented the Agreement from becoming final by the agreed-upon deadline, February 15.

II

The question before us is whether Hughes has standing such that he possesses a right to be heard on his objection to the Settlement Agreement. The bankruptcy court thought the issue "close" and "tricky," but granted Hughes "party-in-interest" standing and ruled against him on the merits. The district court, however, dismissed his appeal on the grounds that he lacked standing in the bankruptcy court. Hughes has standing to appeal the district court's decision, so the question presented is one of bankruptcy standing. *In re Thorpe Insulation Co.*, 677 F.3d 869, 883–84 (9th Cir. 2012).

In order to have standing in bankruptcy court, Hughes must satisfy three requirements. First, he must satisfy the statutory requirements of the Bankruptcy Code and qualify as a "party in interest" under 11 U.S.C. § 1109(b). Second, because he seeks standing in federal court, he must satisfy the constitutional minimum required by Article III. Third, he must meet federal court prudential standing requirements. *Thorpe*, 677 F.3d at 884. The district court concluded that Hughes satisfied neither the "party in interest" nor the Article III requirements of the bankruptcy standing test, and declined to reach the prudential standing requirement.[5]

---

[5] We review "de novo the district court's decision on appeal from the bankruptcy court, applying the same standards applied by the district court, without deference to the district court. The bankruptcy court's conclusions of law are reviewed de novo, and its findings of fact are reviewed for clear error." *Thorpe*, 677 F.3d at 879 (citation omitted). "Standing is an issue of law which we review de novo. Factual determinations underlying the standing decision are reviewed for clear error." *In re Palmdale Hills Prop., LLC*, 654 F.3d 868, 873 (9th Cir. 2011) (citations omitted).

We first address whether Hughes is a party in interest. Hughes advances two arguments. He claims that he is a party in interest because of his future financial stake in the Trust, which holds corporations that are parties to the Settlement. Hughes also argues that he is a party in interest because, under California law, he has a cause of action against Tower Park for its complicity in the trustees' breach of their fiduciary duty. Because we conclude that neither rationale supports the conclusion that Hughes is a party in interest for purposes of § 1109, we decline to address Article III and prudential standing requirements.

A. *Hughes' Financial Stake is Insufficient to Confer Party-in-Interest Status*

We turn to the question whether Hughes is a "party in interest," as required for bankruptcy standing. Section 1109(b) of the Bankruptcy Code governs the right to be heard in Chapter 11 proceedings:

> A *party in interest*, including the debtor, the trustee, a creditors' committee, an equity security holder's committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. § 1109(b) (emphasis added). The Bankruptcy Code does not define the term "party in interest" except operationally: Section 1109(b) supplies us with a list of parties who must be considered parties in interest. Because the list of parties is preceded by the word "including," the list is illustrative, and not exhaustive. We have observed that the

party-in-interest standard has "generally been construed broadly," and that "[c]ourts must determine on a case by case basis whether the prospective party has a sufficient stake in the proceedings so as to require representation." *Thorpe*, 677 F.3d at 884 (quoting *In re Amatex Corp*., 755 F.2d 1034, 1042 (3d Cir. 1985)). At the same time, we have also recognized that our sister circuits have not interpreted "party in interest" to mean "anyone who might be affected by the bankruptcy proceedings"; rather, a party in interest is one who has a "*legally protected interest* that could be affected by a bankruptcy proceeding." *Id.* (quoting *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992)) (emphasis added); *see also In re Global Indus. Techs.*, 645 F.3d 201, 210 (3d Cir. 2011).[6] Thus, an entity "that may suffer collateral damage" but does not have a legally protected interest does not have standing under § 1109(b). *In re C.P. Hall Co.*, 750 F.3d 659, 661 (7th Cir. 2014). Such interests are "too remote to entitle the entity to intervene in a bankruptcy case." *Id.*; *see* 7 Collier on Bankruptcy ¶ 1109.01[1] ("The general theory behind the section is that anyone holding a direct financial stake in the outcome of the case should have an opportunity . . . to participate in the adjudication of any issue that may ultimately shape the disposition of his or her interest.").

Both parties agree that Hughes does not fall under any of the categories of parties in interest listed in § 1109(b). They

---

[6] If we adopted a broader reading, we would effectively collapse the § 1109(b) requirements into Article III standing requirements. Although at least one circuit has suggested that these two measures are "effectively coextensive," *Global Indus. Techs.*, 645 F.3d at 211, we must give some effect to Congress's words. We think that effect was captured in our holding in *Thorpe*: the party asserting standing to object in a bankruptcy proceeding must have a "legally protected interest." 677 F.3d at 884.

disagree over whether Hughes has a legally protected interest in the Settlement approval proceedings such that he constitutes a party in interest under the Bankruptcy Code. Hughes argues that he has a legally protected interest because any loss borne by the Hughes Entities as a result of the Settlement will create a loss for the Trust, which will, in turn, create a loss for Hughes. By contrast, Tower Park contends that Hughes' interest in the Trust assets is too remote, and that allowing trust beneficiaries to participate would clutter the bankruptcy proceeding with collateral issues. While we have not previously addressed whether a trust beneficiary has bankruptcy standing to object to a settlement that may detrimentally affect trust assets, a comparison of our decision in *Thorpe*, 677 F.3d 869, with the Second Circuit's decision in *In re Refco Inc.*, 505 F.3d 109 (2d Cir. 2007), is instructive.

In *Thorpe*, we considered whether certain insurers of a debtor had standing to object to the debtor's Chapter 11 reorganization plan. 677 F.3d at 876. The debtor, Thorpe Insulation Company, faced substantial asbestos-related liability and thus filed a plan of reorganization under 11 U.S.C. § 524(g), a provision of the Bankruptcy Code specially enacted to deal with asbestos claims. *Id.* at 877. As required under § 524(g), Thorpe established a trust for the primary purpose of distributing funds to present and future holders of asbestos claims. *Id.* at 877–78. Thorpe also reached settlements with thirteen of its insurers, which together agreed to provide more than $600 million in assets to fund the trust. *Id.* at 878. In exchange, the settling insurers sought protection under § 524(g)'s sheltering mechanism: an injunction, issued upon plan confirmation, designed to channel asbestos-related claims to the trust. *Id.* The resulting plan permitted asbestos claimants to either bring their claims against the trust or get permission from the trust to sue the

insurers who had not settled with the debtor.  *Id.* at 878–79.
The non-settling insurers objected to the plan, and the
bankruptcy court dismissed their objection for lack of
standing.  *Id.* at 879.

We concluded that the non-settling insurers were parties
in interest because the plan directly affected their legal
interests.  We identified two interests relevant here.  First, we
determined that the non-settling insurers might be bound by
the trust's determination of liability.  Thus, the trust's actions
would have preclusive effect on the non-settling insurers.  *Id.*
at 885–86; *cf. In re Teligent, Inc.*, 640 F.3d 53, 60–61 (2d Cir.
2011) (because entity lacked standing to challenge the
settlement in bankruptcy court, it was not estopped from
asserting a defense challenging the validity of the agreement
in another forum).  Second, the settlement affected the non-
settling insurers' rights to recover costs against settling
insurers, and cost recovery had previously been negotiated in
a contract between the two groups of insurers.  *Thorpe*,
677 F.3d at 886–87.  The non-settling insurers "reasonably
complain[ed]" that if they lacked standing to challenge the
bankruptcy plan, which increased their liabilities, they might
be bound by the plan's valuation of particular insurance
claims even though "they were not permitted to participate in
establishing the valuation matrix" and could not challenge it.
*Id.* at 886.[7]

---

[7] Contrast *Thorpe* with the Seventh Circuit's recent decision in *In re
C.P. Hall Co*.  In that case, also concerned with asbestos and insurance
funds, Hall was in bankruptcy and sought to settle its insurance coverage
with Integrity.  750 F.3d at 660.  Hall had $10 million in insurance
coverage remaining with Integrity, but Integrity was also bankrupt, and
Hall and Integrity agreed to settle for $4.125 million.  *Id.*  Columbia
Casualty was Hall's excess insurer, and it objected to the settlement on the
ground that anything Integrity did not have to pay might be charged to

In *Refco*, the Second Circuit considered whether investors were parties in interest with standing to object to an allegedly fraudulent settlement between their company and the debtor company.  505 F.3d at 111.  In that case, approximately $300 million worth of investment funds belonging to Sphinx, an investment management company, were transferred from Refco Capital Markets, Ltd. ("RCM")—where the funds had previously been invested—to accounts held on Sphinx's behalf at Lehman Brothers.  *Id.* at 112.  Five days after the transfer, Refco, Inc. and its RCM affiliate filed for Chapter 11 bankruptcy.  *Id.* at 112 & n.3.  RCM's creditors sued Sphinx, complaining that Sphinx had effected a preferential transfer and demanding a return of the funds to the RCM estate.  *Id.* at 112.  Sphinx and RCM's creditors eventually reached a settlement in which Sphinx agreed to return $263 million to the RCM estate and waive any claim against RCM related to the transfer, including its right to file a claim against RCM's estate.  RCM filed a 9019 motion, seeking bankruptcy court approval of the settlement.  *Id.* at 111–13.  Sphinx's investors objected, arguing that the settlement was the product of collusion and fraud, and pointed to evidence suggesting that Sphinx's directors had acted ultra vires in agreeing to the settlement.  *Id.* at 113.  The bankruptcy court found that the investors lacked standing to object and approved the settlement.  *Id.* at 114.

On appeal, the investors argued that the settlement would cost them tens of millions of dollars, imposing a direct, pecuniary harm.  *Id.* at 115.  In the alternative, the investors

Columbia.  *Id.*  The Seventh Circuit held that Columbia lacked standing under § 1109(b) because it was "not a creditor of Hall's estate in bankruptcy, [and was] not the debtor."  *Id.* at 661.  Any damage it might suffer was "collateral."  *Id.*

contended that when the Sphinx directors breached their fiduciary duty by entering into a fraudulent settlement, the funds became the *res* of a constructive trust, of which the investors were the beneficiaries.  Because they held a constructive trust over the funds used in the Settlement, they argued, they had standing under the direct-pecuniary-interests test.  *Id.*

The Second Circuit disagreed with the investors' arguments.  It concluded that party-in-interest standing does not extend to those seeking to assert rights that are purely derivative of another party's rights, and here, the investors could not claim to enforce any rights distinct from those of Sphinx.  *Id.* at 117.  The court reasoned that, "[b]y investing in Sphinx, Investors placed control of their funds entirely within the hands of the Sphinx directors . . . . Only Sphinx, not individual Investors, or even Investors as a group, could assert a claim against the Refco estate, and only Sphinx was permitted to negotiate a settlement . . . ."  *Id.*  Therefore, "Investors maintain a financial 'interest' in Sphinx, but they are not a party in interest within the meaning of the Bankruptcy Code."  *Id.*

With respect to the investors' allegations of breach, the court acknowledged that "[i]t may be that the Sphinx directors violated their fiduciary duties by entering into a settlement that was not in the best interests of Investors."  *Id.* at 118.  But the court concluded that the bankruptcy court was not the appropriate forum in which to resolve such a dispute: "Bankruptcy court is a forum where creditors and debtors can settle their disputes *with each other*.  Any internal dispute between a creditor and that creditor's investors belongs elsewhere."  *Id.* at 118 (emphasis in original).  Permitting too many "peripheral parties" status as parties in interest "thwarts

the traditional purpose of bankruptcy laws which is to provide reasonably expeditious rehabilitation of financially distressed debtors with a consequent distribution to creditors who have acted diligently." *Id.* (quoting *In re Ionosphere Clubs, Inc.*, 101 B.R. 844, 850–51 (Bankr. S.D.N.Y. 1989)).  Thus, the court concluded, permitting the investors to enter the bankruptcy plan confirmation process and attempt to prove the "litany of wrongs allegedly wrought by the officers and directors of Sphinx upon Investors"—claims, the court noted, the investors could file elsewhere—would cause a substantial delay in the Refco bankruptcy proceeding and would not be countenanced. *Id.* at 119.

Applying *Refco* and *Thorpe* to the facts of this case, we conclude that Hughes' financial stake in the Trust assets does not make him a party in interest within the meaning of § 1109(b).  The California Court of Appeal has explained that "[a] trust beneficiary has no legal title or ownership interest in the trust assets," and as such, in civil lawsuits, a trust beneficiary's "right to sue is ordinarily limited to the enforcement of the trust, according to its terms." *Saks v. Damon Raike & Co.*, 7 Cal. App. 4th 419, 427 (1992).  In general, therefore, a trust beneficiary is not the entity positioned to take legal recourse to protect the trust assets, unless the beneficiary is seeking only to enforce the terms of the trust.   Here, Hughes' objection to the Settlement Agreement is not an action to enforce the terms of the Trust. Nor has Hughes suggested that his interest in the Trust assets is somehow different from that of an ordinary trust beneficiary.  Indeed, the record shows that the Hughes Entities and other LLC's own the vast majority of assets in the Trust, including all the debt owed the Trust by Tower Park.  Hughes has not claimed any direct ownership interest in the Trust assets, nor any legal entitlement to control or

manage those assets at this time.  He does not, as we held in *Thorpe*, have a "legally protected interest" in the Settlement itself.

Hughes' interest in the Settlement is therefore distinct from that of the insurers in *Thorpe.*  Whereas the insurers demonstrated that the proposed plan directly interfered with their legal rights and financial liabilities, Hughes makes no such showing.[8]  Rather, the financial "interest" that Hughes purports to possess in the trust assets is analogous to the interest possessed by the investors in *Refco.*  While the investors in *Refco* held a financial "interest" in Sphinx's assets insofar as a threat to the assets impacted their return on investment, they did not maintain control or management over the funds.  Once they invested in Sphinx, the investors "placed control of their funds entirely within the hands of the Sphinx directors."  *Refco*, 505 F.3d at 117.  As such, the investors were not parties properly positioned to assert claims or negotiate a settlement relating to those assets.  *Id.*  The same is true for Hughes.  Once Mark Hughes placed assets in the Trust for his son's benefit, he placed control of those assets entirely within the hands of the trustees.  The legally

---

[8] At oral argument, counsel for Hughes argued—for the first time—that the Settlement Agreement directly interferes with Hughes' legal rights because it purports to release claims of any Hughes Entities' beneficiaries against Tower Park.  This argument was not raised before the bankruptcy court, the district court, or our Court prior to oral argument.  It is therefore forfeited.  *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 992 (9th Cir. 2010).  We thus decline to consider whether this provision affects Hughes' legal rights such that he should be accorded party-in-interest status, although a common-sense reading of the Settlement Agreement provision belies Hughes' interpretation.  Hughes is not the owner of the Hughes Entities; he is a beneficiary of the Trust, and the Trust was not a party to the Settlement.

protected interest in the properties at issue here rests with the trustees, not the beneficiary. As such, Hughes is not the party properly positioned to object to the Settlement as it relates to the assets in the Trust—the proper party is FTIC, the trustee ad litem.[9]

*Refco* also demonstrates that an allegation of fraud lodged against parties to the settlement does not change the party-in-interest analysis. While acknowledging that there may very well have been a breach of fiduciary duty by the Sphinx directors, the Second Circuit concluded that such disputes do not belong in bankruptcy court. *Id.* at 119. Likewise, even though Hughes has alleged serious claims of breach against the former trustees of the Trust, such allegations do not convert Hughes into a party in interest. His disputes with the trustees, like the investors' disputes with the Sphinx directors, belong elsewhere. Permitting Hughes to object to the Settlement because of breach by the trustees is collateral to the resolution of claims between the debtor (Tower Park) and its creditors (the Hughes Entities). Indeed, had the bankruptcy court waded in to the relationship between Hughes and the trustees, it might have interfered with actions in the appropriate fora for such challenges: the California courts. The chronology of events in this case confirms this. Hughes has successfully adjudicated his disputes with the trustees in the California probate court and the California

---

[9] We reject Hughes' claim that the district court erred in failing to give proper "deference" to the bankruptcy court's "implied findings of fact" that Hughes had a significant financial stake in the Trust assets. The district court did not dispute this factual contention; rather, the court concluded as a *matter of law* that this financial stake—however significant in monetary terms—was nevertheless "too remote" to confer "party in interest" status. The district court's application of the standards of review was proper. *See Thorpe*, 677 F.3d at 879.

Court of Appeal. *See Hughes*, 2015 WL 1455981, at \*1–2. Bringing disputes between trust beneficiaries and trustees into the settlement approval process interferes with the central purpose of Chapter 11 to promote the efficient reorganization of debtors. *See Toibb v. Radloff*, 501 U.S. 157, 163 (1991) (the purpose of Chapter 11 is to "permit[] business debtors to reorganize and restructure their debts in order to revive the debtors' businesses and thereby preserve jobs and protect investors"). We wish to be clear: by refusing party-in-interest status to Hughes, we are making no judgment as to the validity of Hughes' claims of breach against the trustees. However meritorious they may be, those claims do not confer party-in-interest standing upon Hughes.

As *Refco* recognized, the true party in interest is the party properly charged with representing the financial interests of the affected entity. *See* 505 F.3d at 117 ("Only Sphinx, not individual Investors, or even Investors as a group, could assert a claim against the Refco estate, and only Sphinx was permitted to negotiate a settlement . . . . The party in interest in the bankruptcy sense, representing the Investors' financial interest, is Sphinx."). At present, the Trust is represented by FTIC, which has shown itself willing and able to defend the interests of the Trust. It not only joined Hughes' objection and motion to dismiss before the district court, but has also continued to litigate the Settlement Agreement after Hughes' suit was dismissed. FTIC's appointment as trustee ad litem allays any remaining doubt over whether Hughes' objections should be heard in light of concerns about the former trustees' loyalty to the trust. Indeed, the trustee ad litem was charged with representing the Trust in bankruptcy proceedings and with "analyz[ing] . . . and independently determin[ing] whether the [Settlement] . . . is proper and in the best interests of the Trust," and "tak[ing] whatever action is necessary and

appropriate to promote or forestall approval of [the Settlement]."

FTIC continues, to this day, to challenge the enforceability of the Conditional Provisions. It holds the duty to manage and invest trust funds, and, if necessary, maintain legal proceedings against third parties on behalf of the Trust and its beneficiaries. *See* Restatement (Third) of Trusts § 107(3) (2012) ("In appropriate circumstances, a trustee ad litem may be appointed to consider and, if appropriate, to maintain a proceeding against a third party on behalf of the trust and its beneficiaries."). Thus, even if there were reasons to doubt the adequacy of the former trustees' representation of the Trust, those trustees have since been replaced by FTIC for purposes of litigating the Settlement's scope and validity. FTIC is the present trustee for the Trust, a willing and able advocate for the Trust's assets, and the proper party in interest in this case.

B. *Hughes' Potential Claim Against Tower Park Does Not Confer Party-in-Interest Status*

Hughes seeks to distinguish his case from *Refco*, arguing that he falls into a narrow exception to the general rule that the trustee is the proper representative for the trust in legal actions. Hughes relies on *City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, in which the California Court of Appeal authorized a trust beneficiary to proceed directly against a third party who had allegedly "actively participated with a trustee in a breach of trust for their own financial advantage." 68 Cal. App. 4th 445, 467 (1998). The court characterized this type of claim as "a direct right and not one that is derivative through the trustee." *Id.* (quoting 4 Scott on Trusts § 294.1 (4th ed. 1989)) (emphasis omitted).

Hughes contends that under *Atascadero*, he possesses a claim against Tower Park for participating in the trustees' alleged breach of trust for its own financial gain. Such a claim would not be derivative of the trustees' power to sue Tower Park, but rather a standalone, direct claim of interference with the trustee-beneficiary relationship. Hughes explains that if he can sue Tower Park directly to unwind a collusive settlement, then "common sense dictates that he also satisfies the law's elastic concept of a 'party in interest.'"

We disagree. At best, Hughes' purported *Atascadero* claim fails under that case's own rationale. *Atascadero* held that where a successor trustee is willing and available to protect the trust through appropriate legal proceedings, a trust beneficiary may not maintain separate proceedings to accomplish the same end. Although *Atascadero* held that beneficiaries may sue third parties directly for participating in a breach of trust, the California Court of Appeal was careful to specify that trust beneficiaries may maintain such a suit only if a successor trustee appointed to replace the breaching trustee "has refused to sue or is unavailable." 68 Cal. App. 4th at 467–68 (quoting 4 Scott on Trusts, *supra*, § 294.4). So long as "the trustee is ready and willing to undertake the necessary proceedings," then "the beneficiaries cannot maintain a suit against adverse third parties." *Id.* at 464–65; *see also* Restatement (Third) of Trusts § 107(2)(b) ("A beneficiary may maintain a proceeding related to the trust or its property against a third party *only if* . . . the trustee is unable, unavailable, unsuitable, or improperly failing to protect the beneficiary's interest." (emphasis added)). There is no evidence here that the trustee ad litem failed to take the "necessary and appropriate [actions] to promote or forestall approval of [the Settlement]," as the probate court instructed it to do.

Even if Hughes could bring a direct *Atascadero* claim against Tower Park, it would not change our conclusion that the bankruptcy court is not the appropriate forum for Hughes' dispute with Tower Park. There are more appropriate fora available to adjudicate the numerous and time-consuming issues involved in Hughes' *Atascadero* claim. *See Refco*, 505 F.3d at 118–19 ("We note that although they are not parties in interest . . . Investors may still have remedies for fraud perpetrated by their fiduciaries."). Adjudicating Hughes' *Atascadero* claim would involve a significant amount of time and a litany of issues: whether Tower Park induced, "actively participated with," or aided and abetted the trustees in a breach of trust; whether Tower Park did so for its own financial gain; whether Tower Park received and retained the benefits under the Settlement in knowing breach of trust, etc. *See Atascadero*, 68 Cal. App. 4th at 462. Surely, these questions would have caused a substantial delay in Tower Park's bankruptcy proceeding, contravening the purpose of Chapter 11 to promote "speedy and efficient reorganization." *Refco*, 505 F.3d at 119. Accordingly, even if Hughes has a direct claim against Tower Park, it does not persuade us that bankruptcy court is the appropriate forum in which to hear it and that Hughes should be considered a party in interest.

### III

In sum, we adopt the reasoning of the Second Circuit's opinion in *Refco* and hold that Hughes, as a trust beneficiary, does not possess party-in-interest status under § 1109(b), at least where his interests are adequately represented by a party-in-interest trustee. We also reject Hughes' argument that *Atascadero* distinguishes his case from *Refco*. Because we hold that Hughes lacks statutory party-in-interest status, we decline to address whether Hughes satisfies the Article III

and prudential standing requirements. The judgment of the district court is

**AFFIRMED.**